612 So.2d 1054 (1993)
SUCCESSION OF Mary Patureau HIRT.
No. 91-CA-1232.
Court of Appeal of Louisiana, Fourth Circuit.
January 21, 1993.
Rehearings Denied February 12, 1993.
Writ Denied April 2, 1993.
*1055 Marlin N. Gusman, New Orleans, for appellants, Heirs of Mary P. Hirt.
Robert A. Kutcher, Bronfin, Heller, Steinberg & Berins, and Michael E. Botnick, Roberts, Katz & Baudier, New Orleans, for appellant, Michael E. Botnick.
Stanley H. Caron, in pro per.
Before WARD, ARMSTRONG and WALTZER, JJ.
ARMSTRONG, Judge.
The parties to this appeal, the heirs of Mary Patureau Hirt (the "Heirs"), Michael E. Botnick, attorney for the estate of Mary Hirt, and Stanley H. Caron, executor and accountant for the estate of Mary Hirt, all appeal from a trial court judgment which reduced the amounts paid by Caron to himself as executor and accountant, and to Botnick as attorney, for their respective services rendered to the estate.
Mary Patureau Hirt died on April 22, 1980. Mary Hirt's last will and testament named Stanley Caron, her accountant at the time of her death, as the executor of her estate. Caron subsequently entered into an agreement with Michael Botnick, an attorney, to provide legal services to the estate. On May 6, 1980, Caron filed a petition for probate and for confirmation of himself as testamentary executor of Hirt's estate. Botnick filed the petition. An affidavit of death and heirship listed eight children born of Hirt's only marriage to Alois (Al) Hirt. At the time of Mary Hirt's death, there were ongoing negotiations *1056 with the U.S. Internal Revenue Service concerning the liability of Al and Mary Hirt's community property regime for taxes related to a community interest in the New Orleans Saints partnership. Because of this problem, the succession could not be closed. On September 11, 1986, the Heirs filed a petition to be placed in possession and to set fees, although the executor had already taken his fee, paid full fees to himself as the accountant, and paid Botnick his fees as attorney.
Following trial, an Orleans Parish Civil District Court commissioner held that, under La.C.C.P. art. 3194, Caron, as a succession representative, was prohibited from contracting with himself to do the accounting work for the succession. The commissioner ordered Caron to return $21,059.75 in accounting fees to the estate. The commissioner also found that because there had been a "total disregard" of his fiduciary duties to the estate and the heirs, Caron should receive no more than $10,000 as the executor, and ordered Caron to return $6,600 to the estate. The commissioner also found that Botnick was entitled to a reasonable attorney fee of no more than $20,000, and ordered him to return $16,900 to the estate.
Following the issuance of the commissioner's report, Botnick and Caron filed exceptions with the district court pursuant to La.R.S. 13:1171(G) (Repealed by Acts 1990, No. 8, § 3, eff. Jan. 1991). The district court reviewed the record of the proceedings held before the commissioner[1] and (1) found the heirs had waived their right to assert that it was illegal for Caron to employ his accounting firm to perform services for the succession; (2) found a duplication of work between the executor and accounting firm and accordingly reduced the $21,059.75 accounting fee by $6,000.00; (3) found that a promissory note in the amount of $99,832.00 executed by Al Hirt Enterprises, Inc. to Mary Hirt should not have been included in determining the value of the gross estate upon which the executor's fee and attorney's fee were calculated; (4) set the executor's fee at 2½% of the reduced value of the gross estate or $12,882.72, and ordered Caron to return $3,717.28 to the succession; and (5) found the attorney was entitled to a fee of six percent of the reduced value of the gross estate, or $30,918.54, and ordered Botnick to return $5,981.46 to the succession.
The district court's factual findings and decision based upon those findings may not be disturbed unless they are clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Canter v. Koehring Co., 283 So.2d 716 (La.1973).
We first address the issue concerning Caron, as executor, contracting with his accounting firm to render accounting services to the estate. La.C.C.P. art. 3194 provides in pertinent part:
A succession representative cannot in his personal capacity or as representative of any other person make any contracts with the succession of which he is a representative....

* * * * * *
All contracts prohibited by this article are voidable and the succession representative shall be liable to the succession for all damages resulting therefrom.[2] (Emphasis added)
The district court, noting that such contracts are merely voidable, rather than void, found that the heirs had waived their right to assert that the contract with Caron's accounting firm was illegal because the heirs had retained their own counsel years ago and were aware that Caron's accounting firm was performing services for the succession. For the following reasons *1057 we agree with the district court's decision.
At trial before the commissioner, counsel for Caron argued that the heirs should be estopped from voiding the contract between the succession and Caron's firm for accounting services. Equitable estoppel is defined as:
[T]he effect of voluntary conduct of a party whereby he is precluded from asserting rights against another who has justifiably relied upon such conduct and changed his position so that he will suffer injury if the former is allowed to repudiate that conduct.
American Bank and Trust Co. v. Trinity Universal Ins. Co., 251 La. 445, 205 So.2d 35 (1967); Bellsouth Advertising & Publishing Corp. v. Gassenberger, 565 So.2d 1093 (La.App. 4th Cir.1990).
The doctrine is founded upon good faith and is designed to prevent injustice by barring a party from taking a position contrary to his prior acts, admissions, representations, or silence. Lilly v. Angelo, 523 So.2d 899 (La.App. 4th Cir.1988), writ denied, 526 So.2d 1120 (La.1988). It is a doctrine of last resort. Howard Trucking Co. Inc. v. Stassi, 485 So.2d 915 (La.1986), cert. denied, 479 U.S. 948, 107 S.Ct. 432, 93 L.Ed.2d 382 (1986). In those rare instances when the doctrine of equitable estoppel is applied, three elements must be present: (1) a representation by conduct (including silence) or work; (2) justifiable reliance thereon; and (3) a change of position to one's detriment because of that reliance. Wilkinson v. Wilkinson, 323 So.2d 120 (La.1975); Dizell v. Durr, 519 So.2d 863 (La.App. 4th Cir.1988); Lilly v. Angelo, supra.
Caron's brother was married to one of Mary Hirt's daughtershe was the brother-in-law of one of the heirs. Prior to her death, Mary Hirt had retained Caron as her accountant. Caron was testamentary executor of her estate. All of the heirs knew early on, or certainly should have known, that Caron, or Caron's accounting firm, was providing the accounting services for the succession. A letter from Caron to one of the heirs, Bridgid Hirt Mearnes, dated August 27, 1980, notified her that, among other things, that his firm had already spent in excess of 200 hours on the succession. In November 1980, the heirs contacted a friend of the family, Provino Mosca, an attorney, seeking his assistance in their attempts to settle the estate. Although Mosca was not paid by the heirs, he did undertake to represent them in their dealings with Caron and Botnick, the estate attorney hired by Caron. Mosca communicated with both Caron and Botnick on behalf of the heirs. Mosca represented the heirs approximately two years. Later, the heirs received counsel from another attorney and friend of the family, Louis Merhige.
Not until trial of this matter in 1988 and 1989 did the heirs raise the issue of voiding the contract on the ground that it was prohibited by La.C.C.P. art. 3194. No evidence was presented at trial to indicate what loss the heirs suffered by having Caron's accounting firm, rather than another firm, do the succession accounting work. Considering these facts and circumstances, we find: (1) that the conduct of the heirs their silence as to Caron's firm doing the estate's accounting workamounted to a representation on their part that this arrangement was acceptable; (2) Caron's firm relied on that representation; and (3) Caron performed years of accounting work for the succession.
We find the requirements for an equitable estoppel exist, and hold that the heirs are estopped from voiding the contract for accounting services between Caron as executor and his firm.
We next consider the issue of whether a promissory note with a balance of $99,832.00 executed by Al Hirt Enterprises, Inc. to Mary Hirt should have been considered as part of the value of the gross estate on which the fees of the executor and attorney were based. The heirs maintained they did not want to sue Al Hirt Enterprises to collect on the note, and did not want it included in the gross estate. The promissory note in the original principal amount of $124,790.00 was executed on July 14, 1976 by Al Hirt Enterprises, Inc. in *1058 payment for 100 shares of stock in the corporation received by Mary Hirt in a community property settlement with Al Hirt. The note was to have been paid in ten annual payments of $12,479.00 principal plus seven percent simple interest on the remaining balance.
Apparently, only two payments were made on the note. John Lovell, an accountant for Al Hirt Enterprises, testified that the last payment on the note was made on April 30, 1979. This was approximately one year before Mary Hirt's death. Lovell testified that the note was included in the balance sheet of Al Hirt Enterprises as a liability. He also said the note was a valid enforceable obligation of Mary Hirt's estate in 1980. Michael Guarisco, a tax attorney, testified that, assuming it had not prescribed, the promissory note was an asset of the estate reportable on Mary Hirt's federal estate tax return. He said he "absolutely" would not change his opinion as to the inclusion of the promissory note in the gross estate simply because the heirs said they did not wish the executor to sue Al Hirt to collect on it. He said that did not change the character of the note as an asset of the estate for federal estate tax purposes.
The heirs maintained they did not want to sue Al Hirt Enterprises to collect on the note, and did not want it included in the gross estate. The district court found that the promissory note should not be included "in determining the value of the estate upon which the executor's fee or the attorney's fee should be calculated."
Although two payments had been made on the note as of the time of trial, no payments had been made on the note by Al Hirt Enterprises, Inc. for ten years. Neither Caron nor Botnick performed any real services for the estate relating to the promissory note. The trial court apparently felt that because of this, they should not receive any fee based on the note.
Considering the nature of this promissory note, we see no problem with including the value of the note in the gross estate for purposes of paying estate taxes, and not including it in the gross estate for purposes of determining the fees of the executor and attorney for the estate.
Regardless of a contract for fees, or a statutory fee, attorney fees are always subject to judicial review for reasonableness. City of Baton Rouge v. Stauffer Chemical Co., 500 So.2d 397 (La.1987); Lester v. Lester, 516 So.2d 219 (La.App. 4th Cir.1987). In the instant case, the district court apparently concluded that because Botnick had done practically nothing relating to the promissory note, his receipt of 6% of the value of the note would be unreasonable.
The Code of Professional Responsibility (the "CPR"), which regulates attorney's practices, has been recognized as having the force and effect of substantive law. Saucier v. Hayes Dairy Products, Inc., 373 So.2d 102 (La.1979). Under the CPR, an attorney may not collect in excess of a reasonable fee. The reasonableness of a fee is determined by considering, among factors, the time and labor involved, the difficulty of the questions involved, and the skill requisite to perform the legal services properly. CPR, Disciplinary Rule 2-106. Considering the time and labor involved, the difficulty of the questions involved, and the skill requisite for Botnick to perform services related to the promissory note, we are unable to find that the trial court was clearly wrong in finding that a fee which included 6% of the value of the promissory note was not reasonable. Botnick's fee was properly reduced to 6% of the value of a gross estate which did not include the note.
Because Caron performed virtually no services related to the note, we are unable to say that the trial court erred in finding that Caron was not entitled to a fee based on the value of the note. In addition, the trial court properly determined that Caron was entitled only to the 2½% fee set by La.C.C.P. art. 3351, and no "additional compensation." Caron's fee of 2½% was properly determined based on a gross estate which did not include the value of the promissory note.
*1059 Plaintiffs next argue that Botnick's fee of 6% of the value of the gross estate was excessive because his work product and the relatively simple nature of the succession do not justify such a fee. The trial court apparently considered the evidence in light of the DR 2-106 factors and determined that Botnick was entitled to the 6% fee.
Botnick contracted with Caron for a fee of between 4-6% of the value of the gross estate. Botnick wrote Rebecca Hirt Dickerson in December 1980 and informed her that, he would be taking between 4-6% of the gross estate, as per a fee schedule, as his fee. Rebecca Hirt Dickerson took an interest in the handling of the succession and, for all practical purposes, along with Bridgid Hirt Mearnes, represented the other heirs in their dealings with Botnick and Caron. Both of these Hirt heirs, and no others, testified at trial. Bridgid Hirt Mearnes testified that she saw the December 1980 letter written by Botnick to her sister Rebecca. She too understood it to mean that the fees were "set by law." Provino Mosca, the attorney and friend of the family, testified that he received a copy of the December 1980 letter from Botnick to Rebecca Dickerson. Mosca testified that he believed that he discussed Botnick's attorney fee of 4-6% with the heirs. He believed he indicated that certain fees were set by statute and that an attorney fee based upon a percentage was not uncommon.
Morris Philips, an attorney qualified as an expert witness in successions and estate work, was presented by plaintiffs. Philips testified that he was aware of no prohibition against a fee agreement between an executor and an attorney for the succession. However, he said that if there was such an agreement, it would be important for the executor to have an agreement with the heirs. He said a fee agreement did not need to be in writing. However, he testified that based upon his review of the record, a fee of 6% was not reasonable.
Michael Guarisco, an attorney, was qualified by defendants as an expert in the administration of tax matters involving successions and the general practice of succession work. Presented with a hypothetical matching the facts of Mary Patureau Hirt's succession, Guarisco testified that an attorney fee of 6% was not unreasonable. Two of the factors he considered were a potential tax liability of 15-20% of the gross estate and the existence of eight heirs.
Considering the record evidence, we are unable to say the trial court was clearly wrong in accepting the testimony of Michael Guarisco over that of Morris Philips as to the reasonableness of a fee of 6% of the value of the gross estate in this case.
Plaintiffs submit that Caron was not entitled to a fee of 2½% of the amount of the gross estate because he failed to manage the succession as a prudent manager. Plaintiffs cite eight factors pertaining to Caron's performance which purportedly justify the court setting a lesser fee. They first cite Caron's contracting with his own accounting firm to provide services to the succession in contravention of La. C.C.P. art. 3194. While Caron did violate the prohibition of La.C.C.P. art. 3194, and his action should not be condoned, the heirs have presented no evidence that this action adversely affected his administration of the succession or the rights of the heirs.
Caron did apparently fail to include as an asset of succession, royalty income from RCA Victor Records for sales of records recorded by Al Hirt. As of the date of trial before the commissioner, the estate would have been due approximately $23,000.00 in such royalty income, according to Al Hirt's secretary and bookkeeper. Neither Caron nor Botnick had an acceptable excuse for this omission.
Plaintiffs claim Caron "inflated" the value of jewelry and furs, and later reduced them. Plaintiffs are correct in their assertion that initial values placed on jewelry and furs were later reduced. However, the record shows that these items were valued by independent appraisals. The values later placed on the items were the result of appraisals by different persons. There is nothing to indicate that Caron purposely *1060 sought to have inflated values placed on the items.
Plaintiffs claim that Caron paid excessive fees to Botnick, and paid him before the succession was even completed. Caron agreed to pay Botnick between 4% and 6% of the value of the gross estate as his fee. Botnick was eventually paid 6% of the value of the gross estate. Morris Philips, the expert witness presented by plaintiffs, testified that an attorney is entitled to draw against his fee as a succession progresses. For the reasons previously stated, we find that the fees paid to Botnick were not excessive.
Plaintiffs claim the executor failed to pay federal income taxes timely to stop the accrual of interest that was "either 18 or 20 percent." The taxes related to the Hirts' community property interest in the New Orleans Saints football team partnership. A proposed settlement with the IRS involving the Saints partnership was communicated to the heirs, and subsequently to Caron, in late 1982 by an attorney for the partnership. However, the tax liability of Al and Mary Hirt was still an issue because it was a community debt and, although the community property settlement divided the debt equally as between the two parties, the IRS was not bound by the settlement and could go after either party for the entire tax liability. An IRS revenue agent's report specifically addressing the tax liability of the Hirts was issued on April 18, 1984. Caron issued a check for the estate's one-half share of the tax liability one month later. An expert witness presented by plaintiffs, Robert Winston Jr., a certified public accountant, testified that the revenue agent's report was an indication by the IRS that it would agree to be bound by a tender of the estate's share of the tax liability, and not go after it for Al Hirt's share.
Winston agreed that if there was doubt as to the collectability of one-half of the taxes from Al Hirt, "[t]o be very conservative," a prudent administrator would have held back the share owed by the estate. This is what Caron did. When he received the revenue agent's report in which the IRS more or less agreed to accept one-half of the community tax debt from the estate and release it from further liability, Caron paid the IRS. Al Hirt did not pay his share until sometime in 1985. A final release from the IRS was not issued until 1986. The money Caron would have used to pay the IRS earlier was invested and earning interest. Plaintiffs' expert, Winston, testified that during the time this money was invested the interest rate was very high.
Plaintiffs' argument that Caron mismanaged the estate because he did not wish to pay the IRS until it was clear that the estate would not be held liable for Al Hirt's share of the tax liability is without merit. The evidence supports the view that a reasonable administrator might have done the same thing.
Plaintiffs next claim Caron mismanaged the estate by consistently filing the annual accounts "late." La.C.C.P. art. 3331 states that the succession representative "shall file an account annually...."
The succession was opened on May 6, 1980. The first annual account was not filed until June 30, 1981, and it covered the period from April 22, 1980 through December 31, 1980. The annual account for the period ending December 31, 1981 was not filed until July 27, 1982. The annual accounts for the periods ending December 31, 1982 and December 13, 1983 were both filed November 5, 1984. Although La.C.C.P. art. 3331 does not state that an annual accounting be filed within a certain period following the end of the annual period, by any stretch of the imagination it must be considered that Caron filed more than one annual accounting late.
However, there is no evidence that plaintiffs suffered any damage as a result of Caron filing late annual accountings. Morris Philips, plaintiff's expert in successions and estate work, testified that he noticed the late annual accounting filings in the record, but could not tell whether or not the late filings were detrimental to the heirs. The Code of Civil Procedure provides no remedy for reducing the fee of an executor who files late annual accountings, other than seeking to remove him from *1061 that position for mismanagement pursuant to La.C.C.P. art. 3182. The heirs, through their attorney, Provino Mosca, filed a motion to remove Caron, but later dismissed it. Under these circumstances, we cannot say that the trial court erred in failing to reduce Caron's fee because of his late filing of annual accountings.
Although on the one hand plaintiffs argue that the value of the promissory note executed by Al Hirt should not be included in the gross estate, they also argue that the estate was mismanaged, in part, because Caron "failed to collect" on the note, which they characterize as "an asset of the estate." Both Botnick and Caron testified that plaintiffs did not wish to pursue collection on the note. One of the plaintiffs, Rebecca Hirt Dickerson, testified that the note was "a worthless note." Caron and Botnick were following the wishes of the heirs not to initiate collection proceedings against their father to collect on the note. There is no merit to the position taken by plaintiffs that the estate was mismanaged, in part, because no steps were taken to collect on the note.
Finally, plaintiffs argue that the estate was mismanaged, in part, because Caron's actions "compelled the heirs to retain additional counsel to protect their investments and to preserve the estate from his overreaching." It is clear that plaintiffs were not happy with Caron's administration of the estate. However, the "additional counsel" "retained" by plaintiffs accomplished little, if anything. Caron continued to administer the estate as he had been doing. The plaintiffs chose to obtain the advice of outside counsel not because Caron was mismanaging the estate, but because they were not happy with the way he was managing the estate. In his testimony, one of these "outside" attorneys, Provino Mosca, stated that Caron "had a difficult role of trying to act as independently as possible and as neutrally as possible in a situation where, frankly, he couldn't do it." Mosca testified that at one point Caron wanted to turn the administration of the estate over to someone else. Mosca testified that he, himself, did not want the job.
The only thing of any consequence Caron may have done incorrectly was failing to obtain the RCA Victor royalties for the succession, and there is no evidence that these cannot be recovered. We believe the evidence furnishes a basis for the trial court's obvious finding that Caron did not mismanage the estate, or, that if he did do something incorrect in administering the estate, he was nevertheless entitled to his fee.
Caron appeals the trial court's reduction of his accounting fee by $6,000.00, from $21,059.75 to $15,059.75, based upon the court's finding that there had been a duplication of work between the executor and his accounting firm. Robert Winston, Jr., the expert in accounting for estates, testified that he reviewed the files of Caron and could not tell which reflected accounting work and which reflected Caron's duties as executor. On cross-examination, Caron had difficulty substantiating his accounting fees. However, Ellen Yellin, an expert in accounting, testified that, although she didn't have the exact number of hours Caron's accounting firm worked on the succession, she estimated it to be 650 hours, based on her review of Caron's records. Even at the rate of $40.00 per hour that Caron was charging the succession in 1980, this would be $26,000.00, more than the $21,059.75 he, as executor, paid his firm. We find no support in the record for the trial court's reduction of the fee by $6,000.00.
Botnick and Caron ask that they be awarded attorney fees for services rendered in defending their administration of the succession. They cite the case of Succession of Meier, 204 So.2d 793 (La.App. 4th Cir.1967), in which this court cited with approval the case of Succession of Moore, 42 So.2d 907 (La.App. Orleans 1949), which held that an administrator may defend his administration of the succession at the district and appellate court levels and charge the costs incurred therein against the succession. However, these costs have been disallowed against the succession when they were incurred primarily in the interest of the administrator. Succession of Bradford, *1062 130 So.2d 702, 706 (La.App. 2d Cir. 1961). As the expenses incurred by Botnick and Caron benefitted themselves, not the heirs or the testator, we find that they are not entitled to charge the expenses to the succession.
For the foregoing reasons, we amend the judgment of the trial court to provide that the accounting fee paid to Stanley H. Caron, CPA, a Professional Corporation, be set at the amount he has already received, $21,059.75. We affirm the judgment of the trial court in all other respects and as amended.
AMENDED; AFFIRMED AS AMENDED.
NOTES
[1] The district court correctly applied a preponderance of the evidence standard in reviewing the record of the proceedings before the commissioner. See Duroncelet v. Doley, 530 So.2d 653 (La.App. 4th Cir.1988), writ denied, 533 So.2d 22 (La.1988).
[2] La.C.C.P. art. 3195 provides exceptions to the general rule of La.C.C.P. art. 3194. One of these exceptions is when the testament provides otherwise. Although Mary Patureau Hirt's testament did not provide that Caron was to be the succession accountant, he had been the decedent's tax accountant since 1979, and was her accountant at the time of her death.